**Dora NOFFKE, Appellant,**

v.

**Jose PEREZ and Neyda Perez, Appellees.**

No. S–12185.

Supreme Court of Alaska.

March 21, 2008.

Paul W. Waggoner, Law Offices of Paul Waggoner, Anchorage, for Appellant.

Michaela Kelley Canterbury, Kelley & Canterbury, LLC, Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

This appeal arises from a car accident on Lake Otis Parkway in Anchorage in which Dora Noffke's vehicle struck a car driven by Jose Perez. A jury awarded Jose Perez $24,000 and passenger Neyda Perez $54,000 for past and future damages, and Dora Noffke appeals several decisions of the superior court. Noffke argues that the superior court erred by excluding certain medical records exhibits, requiring her expert witness to produce his income tax records, granting a directed verdict on comparative negligence to the Perezes, and unnecessarily delaying entry of final judgment. Because the trial court's erroneous decision to exclude the Perezes' medical records was prejudicial and because there was sufficient evidence to send the issue of comparative negligence to the jury, we reverse and remand for a new trial.

## II. FACTS AND PROCEEDINGS

On May 10, 2003, Dora Noffke was traveling north on Lake Otis Parkway. She pulled into the left-hand turn lane to make a left turn into a strip mall.[1] There was evidence that the right-hand southbound lane of Lake Otis was blocked due to road construction south of the accident site, causing congestion in the left-hand southbound lane. The right-hand southbound lane was mostly clear at the accident site. A motorist in the left-hand southbound lane waved at Noffke to signal that she could turn in front of him across the oncoming traffic. Noffke failed to check if the right-hand southbound lane was empty when she made the turn across the southbound lanes. Noffke turned in front of the car driven by Jose Perez, who was proceeding southbound in the right lane, causing a collision. Noffke and her passenger, Bobby Rice, were taken to the hospital. Neyda Perez, the passenger in the Perez car, was also taken to the hospital from the scene, while Jose rode along in Neyda's ambulance and was checked at the emergency room.

Trial was held before Superior Court Judge Mark Rindner. Noffke conceded negligence, and Judge Rindner granted the Perezes' request for a directed verdict on the issue of comparative negligence. Thus, the only questions left for the jury were whether Noffke was the legal cause of injury to Jose and Neyda and the amount of damages to which Jose and Neyda were entitled for past economic loss, as well as past and future non-economic loss. The jury awarded Jose $24,000 and Neyda $54,000. Judge Rindner entered final judgment on January 3, 2006, and Noffke appeals.

---

1. While the police report indicated Noffke was turning onto East 55th Avenue, that street does not intersect with Lake Otis Parkway. Instead, it seems likely that Noffke's testimony more accurately reflected her destination: the strip mall at 5500 Lake Otis Parkway.

## III. STANDARD OF REVIEW

 We review the superior court's evidentiary rulings for abuse of discretion.[2] The court's discovery rulings are also reviewed for an abuse of discretion.[3] An abuse of discretion will be found when we are "left with a definite and firm conviction after reviewing the whole record that the discovery ruling was erroneous."[4] The superior court's award of discovery sanctions is reviewed for abuse of discretion.[5] The court's decision to admit expert testimony is reviewed for abuse of discretion, but where the admissibility of expert testimony turns on a question of law, we apply our independent judgment.[6] When reviewing an order granting a directed verdict, we must decide "whether the evidence, when considered in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment."[7]

## IV. DISCUSSION

### A. It Was Error To Exclude Noffke's Proposed Medical Records Exhibits and To Refuse Noffke's Requested Continuance To Subpoena Records Custodians.

 At the pretrial conference on November 18, 2005, Noffke requested that the parties stipulate to the "authenticity" and "foundation" of a number of exhibits relating to Jose and Neyda Perez's medical treatment. Although the Perezes' attorney reserved her objections to the relevancy of the medical records exhibits in question, the parties agreed that it would not be necessary for Noffke to subpoena the records custodians for trial:

MR. WAGGONER [Noffke's attorney]: ... I would like an answer about the foundation for medical records because it makes a difference as to who I'm going to subpoena. They're just medical records

and I can clearly subpoena enough people to get them all into evidence, but I was just wondering what the plaintiff is going to require.

· · · ·

THE COURT: ... [T]he question is whether you're going to say bring in the records custodian for each and every provider of the medical records to sit up here for five or ten minutes to testify that these are the medical records of the plaintiffs, they're kept in the ordinary course of business to satisfy the requirements of the hearsay rule and then their authenticity will be done then, or everybody can say they don't have any objections to authenticity, they're reserving objections to relevance and that sort of stuff and you don't need witnesses. I'll rule on the relevance as I hear the testimony and what it's being offered for.

MS. KELLEY CANTERBURY [the Perezes' attorney]: I don't have a disagreement. I agree that those are the records. There's no authenticity problems.

· · · ·

MR. WAGGONER: That's fine. I will stipulate to the foundation of medical records.

THE COURT: Does everybody agree we don't need—that the foundation is established but that objections as to relevance and other things are not established but that nobody needs to produce custodians of medical records to go through the drill of doing that? I think that's all you're both asking for.

MS. KELLEY CANTERBURY: Yes.

MR. WAGGONER: Right.

Relying on this agreement, Noffke sought at trial to introduce evidence of the Perezes' preexisting medical conditions, asserting, "[i]t's my understanding there's no foundation objection to these older medical records,

---

**2.** *Bierria v. Dickinson Mfg. Co., Ltd.,* 36 P.3d 654, 657 (Alaska 2001).

**3.** *Marron v. Stromstad,* 123 P.3d 992, 998 (Alaska 2005).

**4.** *Id.*

**5.** *Int'l Seafoods of Alaska, Inc. v. Bissonette,* 146 P.3d 561, 566 (Alaska 2006).

**6.** *Marron,* 123 P.3d at 998.

**7.** *Hagen Ins., Inc. v. Roller,* 139 P.3d 1216, 1219 (Alaska 2006) (quoting *Bobich v. Stewart,* 843 P.2d 1232, 1235 (Alaska 1992)).

Your Honor." At that time, the trial court instructed Noffke's attorney to pare down the exhibits, directing Noffke to "narrow [the exhibits] down to matters that might have some relevance [ ] to this case" in order to avoid "dumping" all of the records on the jury.

During her cross-examination of Jose Perez, Noffke again sought to introduce Exhibit M, which contained a number of exhibits that were prepared to determine the Perezes' eligibility for workers' compensation as well as disability benefits from the Social Security Administration. The trial court advised: "You're going to have to lay a foundation for that." The trial court also instructed Noffke to break Exhibit M into smaller exhibits, warning, "I'm not admitting that unless there's [a basis] laid for portions of it … either [for] relevance or otherwise."

After Jose Perez completed his testimony, Noffke complied with the trial court's instruction and divided Exhibit M into seven smaller exhibits, marked M1 through M7. The Perezes objected to all of these exhibits as hearsay, asserting that "[t]hese aren't medical records" and complaining that Noffke had failed to examine Jose Perez about them when he was still on the witness stand. When the trial court expressed doubts about the exhibits, Noffke responded, "[t]here's no foundation objection and some of the other M records are definitely medical records and I think they should be admitted."

Although the trial court admitted those documents in the exhibits that contained Jose Perez's signature, such as a disability report form that Perez submitted to the Social Security Administration in which he provided information about his medical conditions, the trial court disallowed exhibits M3 through M7 on hearsay grounds, noting that they had been gleaned from Jose Perez's Social Security file and that there was no evidence establishing that they were medical records:

> THE COURT: [Exhibit M3] is hearsay and I see no exception for it. The fact that it's a medical record hasn't been established by testimony. It may well be one, but you needed to call somebody to do

that.… You haven't established that it's not hearsay, Mr. Waggoner.

. . . .

MR. WAGGONER: You say [Exhibit M4 is] not a medical record?

THE COURT: I'm saying that you haven't established [through] eviden[ce] that it's a medical record—the circumstances under which it was created. You need a witness to testify that this is a medical record kept in the regular course of business.… And all we know is that it comes from Social Security records, not even from a medical doctor's records. So you've got to—I realize this may seem like form over substance, but you've got to establish a hearsay exception for these documents to be admitted and you haven't.

. . . .

MR. WAGGONER: Yeah. At the pretrial conference, I specifically asked about foundation for medical records . . . . .

THE COURT: And this is not a foundation . . . . .

MR. WAGGONER: . . . . . .for the purpose . . . . .

THE COURT: This is not a foundation ruling. It's a hearsay ruling.

The trial court went on to exclude a Northern Rehabilitation Services report, Exhibit G, ruling: "You have to establish not just that they're medical records but they're kept in the regular course of business." The trial court also declined on hearsay grounds to admit Neyda Perez's Westchester Physical Therapy records, Exhibit K; Independent Medical Evaluation reports on Neyda Perez conducted by Dr. James, Exhibits L and P; and an evaluation of Neyda Perez for work by Dr. Lipke, Exhibit S.

The next morning before closing arguments, Noffke again attempted to introduce her exhibits. The trial court reiterated that its ruling was not a foundation ruling but a hearsay ruling and refused to admit the exhibits. Noffke asked for a short continuance of one business day, from Friday to Monday, to call the records custodians to lay the foundation for the unadmitted exhibits; the trial court denied this request. Noffke then sought to introduce Exhibit I, Jose Perez's

medical records from Kremer Chiropractic in 1998–1999. The trial court admitted only a medical information form, which had been signed by Jose Perez and on which Jose had described his symptoms and medical history, characterizing it as "an admission." But the court did not permit other chiropractic records, including a radiology consultation and the chiropractic clinic patient history form.

Noffke argues that the medical records exhibits should have been admitted, maintaining that the parties waived any foundation objections when they entered the stipulation at the pretrial conference. Noffke reasons that if a party is required to call a records custodian to establish that a document is a business record, then waiving foundation objections serves no purpose. Noffke also contends that once she learned that the trial court would require testimony to establish that the proposed exhibits were business records, despite the earlier stipulation on foundation, she should have been granted the requested one-day continuance to allow her to subpoena and procure the testimony of the various records custodians. Noffke maintains that in the context of the disputed exhibits, the stipulation as to the foundation of the medical records removed the need to call witnesses to establish the business records exception to the hearsay rule.

Our analysis begins with a parsing of what the parties agreed upon in their November 18, 2005 pretrial conference. The conference included an informal attempt, under Alaska Civil Rule 36, to "[r]equest[ ] that documents which clearly fall within a hearsay exception be admitted without having to put the record-keeper on the stand," one of the "central purposes for which Rule 36 was designed."[8] The transcript reveals that the parties arrived at a stipulation that "[t]here [are] no authenticity problems," "the foundation is es-

tablished," and "nobody needs to produce custodians of medical records."

The wording of this oral stipulation was unfortunately imprecise. The parties not only conflated the terms "authenticity"[9] and "foundation,"[10] but also vaguely referred to the subjects of the stipulation as "medical records." Calling Noffke's proposed exhibits "medical records" was confusing because the exhibits Noffke attempted to introduce were not obtained from doctors' offices, but rather consisted primarily of medical records prepared to determine the Perezes' eligibility for workers' compensation and Social Security disability benefits. The Perezes did not discuss the origin of the exhibits during the pretrial conference and entered into the stipulation having had ample opportunity to review and object to the records. Later, when it became clear to the court that the records Noffke wished to introduce were not typical medical records, the court ruled that the foundational requirements had not yet been met.

█ At trial, the Perezes argued that some of the documents offered by Noffke were not medical records because they were "letters" from doctors, implying that because the records did not take the form of traditional medical charts, they could not be admissible because they were hearsay. But in *Dobos v. Ingersoll*, we recognized that "medical records, including doctors' chart notes, opinions, and diagnoses, fall squarely within the business records exception to the hearsay rule."[11] Evidence of the Perezes' medical treatment and diagnosis, even in the form of a doctor's letter to the Social Security Disability Determination Unit, could be admissible under our holding in *Dobos*, provided litigants establish that "it was the regular practice" of the doctor to prepare and send evaluation reports to the unit.[12]

**8.** *Dobos v. Ingersoll*, 9 P.3d 1020, 1028 (Alaska 2000).

**9.** "Authentication" is defined as "the act of proving that something (as a document) is true or genuine, esp. so that it may be admitted as evidence; the condition of being so proved." BLACK'S LAW DICTIONARY 142 (8th ed.2004).

**10.** "Foundation" is defined as "[t]he basis on which something is supported; esp. evidence or testimony that establishes the admissibility of other evidence." *Id.* at 682.

**11.** 9 P.3d at 1027.

**12.** *See id.; see also Liimatta v. Vest*, 45 P.3d 310, 318 (Alaska 2002); Alaska R. Evid. 803(6).

A review of the parties' agreement reveals that Noffke's reliance on the pretrial stipulation was appropriate. The foundation requirements for the business records exception to the hearsay rule [13] are as follows: first, the records must be of a "regularly conducted business activity"; second, the record must "be regularly kept"; third, the source of information "must be a person who has personal knowledge"; fourth, the information must have been "recorded contemporaneously with the event or occurrence"; and fifth, "foundation testimony by the custodian of the record" must be provided.[14] The parties' broad stipulation during the pretrial conference clearly indicated that Noffke would not be required to subpoena a records custodian to testify to each of these foundation requirements. As such, the Perezes stipulated to the admissibility of the records, at least for hearsay purposes.[15] In so doing, they waived any foundation or authenticity objections.

The Perezes further argue that the business records exception "does not apply because the reliability of the offered documents was questionable, and the Perez[e]s were not able to cross[-]examine the content of the documents." But the Perezes stipulated to the foundation of the documents in the pretrial hearing; the only difference in the exhibits between the time of the stipulation and the time of this objection was that they had been divided into subparts according to the trial court's direction.

■ The trial court expressed concern that records obtained from the Social Security Administration do not qualify as "medical records" within the business records exception to the hearsay rule. But a business record can come from any business,[16] including a doctor's office, a hospital, or the Social Security Administration. We held in *Liimatta v. Vest* that while communication between medical doctors and the Social Security Disability Determination Unit is not a "medical record" of the type "often admitted under the business records exception," a record of such communication can be admitted as a business record when parties "establish that it was the regular practice of [the doctor] to prepare and send evaluation reports to the Social Security Disability Determination Unit." [17] Noffke reasonably relied upon the stipulation to conclude that she was not required to lay such a foundation. The stipulation fairly indicated that if the Perezes wanted to exclude the records, they would have to rely on some non-hearsay basis to do so.

The trial court still must determine the relevance of the documents, as well as whether they will be cumulative or confusing to the jury.[18] The Perezes expressly reserved their objections on these other grounds. But because medical and Social Security records are admissible under the business records exception to the hearsay rule, and the parties stipulated to the foundation of the records, the court should have admitted the records, subject to any relevance objections, Alaska Rule of Evidence 403 balancing, and potential redactions to ensure that the records would not be confusing to the jury.

■ Even though it was error to exclude the exhibits, Noffke must still show that the error was harmful or prejudicial.[19] The test for determining whether an error

---

13. Alaska R. Evid. 803(6).

14. 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 8:78 (3d ed.2007).

15. At the pretrial hearing, following a discussion of the stipulation, the court asked the following:

> Does everybody agree we don't need—that the foundation is established but that objections as to relevance and other things are not established but that nobody needs to produce custodians of medical records to go through the drill of doing that?

In response, the Perezes answered: "Yes."

16. Alaska R. Evid. 803(6) defines "business" to include "business, institution, association, occupation, and calling of every kind, whether or not conducted for profit."

17. 45 P.3d at 318 (internal citation and quotation omitted).

18. *See, e.g., City of Kodiak v. Samaniego,* 83 P.3d 1077, 1087–88 (Alaska 2004) (applying Alaska R. Evid. 403 to exclude relevant evidence because it could confuse the jury); *see also* Alaska R. Evid. 401.

19. *See Marron,* 123 P.3d at 1011.

was harmless is "whether on the whole record the error would have had a substantial influence on the verdict of a jury of reasonable laymen." [20] After oral argument on appeal, the parties were asked to submit additional briefing on the issue of harmless error. One of Noffke's defense theories at trial focused on the Perezes' preexisting medical conditions. Because this defense was central to her case and because inclusion of the medical records could have affected the jury's damages awards, we conclude that the exclusion of Noffke's proposed exhibits was prejudicial error.

Jose Perez testified that in 1991 or 1992 he hurt his back at work picking up trash. He stated that the back injury was a disc injury but indicated that it no longer caused him problems. Jose further testified that he was on Social Security disability because of his previous back injury. In describing the treatment regime for that injury, Jose testified that he was sent to the YMCA "to do the treadmill and the bicycle ... for about 15 sessions."

Noffke alleges that Jose's testimony at trial differed significantly from what was indicated in his medical records. The Social Security records show that the injury to Perez's back actually occurred in October 1994. The medical records reveal that Jose Perez saw five different doctors for treatment after the initial injury to his back and before the car accident. In Dr. Levine's report a year after the back injury, he notes that Jose reported that he was experiencing pain at a level of seven to eight out of ten. Jose also received two epidural steroid injections for the back injury, with no effect. The doctor's evaluation also states that the pain had a "nonphysiologic nature" and there was possible "somatic overlay" in the pain.

Noffke alleges that there are similar discrepancies between Neyda Perez's testimony at trial and the evidence contained in her medical records. In her testimony at trial, Neyda mentioned that she had suffered a back injury in 1991 and that she had previously experienced carpal tunnel injuries on both her right and left hands. The medical records that were not admitted at trial, however, reflect that Neyda also had a shoulder injury, that her injuries required often extensive and long-term treatment, and that she had been diagnosed with a degenerative disc disease.

The excluded records relating to the Perezes' preexisting conditions could have affected the jury's verdict. The difference between Jose and Neyda's testimony about their prior injuries and what the exhibits showed regarding their injuries could have affected their credibility. Additionally, the information in the exhibits could be read as indicating that the Perezes' injuries and treatment were much more extensive than revealed in their testimony. Given that their damages are affected by how much treatment they would need to return them to their pre-accident states, the exhibits are important evidence of Jose's and Neyda's pre-accident states and therefore could have changed the verdict of a reasonable juror.[21]

■ Following the trial court's rulings excluding evidence of the Perezes' preexisting medical conditions, Noffke proposed to the court a way to accommodate the Perezes' concerns about foundation: she requested a one-day continuance to call the records custodians to establish foundation. The court denied this request. We find that the trial court's ruling that Noffke could not have a one-day continuance to call the records custodians was error. Any doubts about the authenticity of the records should have been resolved either through the pretrial stipulation or by allowing Noffke to subpoena the relevant custodians of records. Given the confusion surrounding the pretrial stipulation and the relevance of the Perezes' preexisting medical conditions to the question of damages, it was prejudicial error for the court to deny Noffke the opportunity to call in records custodians to lay the foundation for the admissibility of the exhibits.

**B. The Superior Court Did Not Abuse Its Discretion by Requiring Noffke's Expert To Produce Tax Returns Before Allowing the Expert To Testify.**

■ Noffke's expert, Dr. Richard Peterson, performed a review of Jose and Neyda's

20. *Dalkovski v. Glad,* 774 P.2d 202, 207 (Alaska 1989).

21. Noffke also alleged that Neyda Perez had a preexisting back condition.

medical records. In discovery, the Perezes served Noffke with a request for production, asking for Dr. Peterson's income from the company he worked for, The Independent Medical Evaluators (TIME), for the years 2002–2005. The request sought Dr. Peterson's tax returns, as well as the tax returns for TIME for the same time period. The Perezes originally filed an expedited motion to quash the videotaped deposition of Dr. Peterson until Noffke complied with their request for production of his tax returns. The trial court noted that it had compelled experts' tax returns relating to income earned as expert witnesses in similar cases but that TIME's tax returns would not ordinarily be required unless Dr. Peterson was also a partner or owner of TIME. Noffke opposed the motion, arguing that requiring defense experts to produce their tax returns would have a chilling effect on experts, leaving fewer experts willing to testify. Noffke also argued that evidence of bias could be presented without requiring the expert to produce his tax returns.

The trial court ruled that the Perezes' request for production of the tax returns of both TIME and Dr. Peterson was proper and that the Perezes were entitled to the information. The trial court disagreed that requiring such tax information would chill the ability of parties to obtain expert witnesses and found that the tax returns would be relevant to show potential bias. The trial court then granted the Perezes' motion to postpone the deposition of Dr. Peterson until the requested information had been provided. The Perezes were also awarded $900 in attorney's fees as a sanction for Noffke's failure to provide the discovery. Noffke then moved for reconsideration of the sanction. In denying the motion, the court noted that the $900 sanction was based on the time the Perezes' attorney reportedly spent on the motion practice and the relative reasonableness of the parties' positions.

Dr. Peterson and TIME filed a motion to intervene in order to obtain a protective order for their financial records. Dr. Peterson and TIME expressed their willingness to produce the records if the court issued a protective order limiting the use of the infor-

mation to this case and keeping the information confidential. The trial court directed the parties, TIME, and Dr. Peterson to enter into a confidentiality agreement regarding the tax records. Noffke then indicated in a status report that she would not produce the tax returns of TIME and Dr. Peterson.

The issue came up again at the pretrial conference. The trial court offered the parties a continuance of the trial date, scheduled to start in late November 2005, in order to allow Dr. Peterson to produce the records and be deposed in January. But Noffke reaffirmed that she would not comply with the discovery order. The trial court indicated that Dr. Peterson would not be permitted to testify without first providing the required discovery including his tax records:

THE COURT: Excuse me, Mr. Waggoner. Let's get that record real, real clear about this. I did not strike your expert witness. You indicated that you would not comply with my orders in this court and you were not going to have the witness testify under those circumstances.

MR. WAGGONER: Right.

THE COURT: That was what the indication was and I offered you a continuance if you wanted to have your expert comply with my order to get the testimony of your expert when he next came through town and could be deposed so that he could testify in this trial. That opportunity was always available to you, and so you're the one who made the strategic decision for reasons that you chose that you weren't going to comply with that order.

MR. WAGGONER: Right. I agree with that. You've stated it right. I—it's my view that your order is improper and that's why we wouldn't comply with it and the effect of that was that my expert witness was stricken.

Noffke argues that the trial court erred in ordering Dr. Peterson and TIME to produce their tax returns before allowing Dr. Peterson to testify. Noffke also objects to the $900 discovery violation fine.

In general, our rules favor "a system of liberal pretrial discovery."[22] Alaska Civil Rule 26 provides that "[p]arties may obtain discovery regarding any matter[ ] not privileged which is relevant to the subject matter involved in the pending action...." Income tax returns are not privileged from discovery under Alaska statute or case law.[23] Here, the trial court determined that the tax returns were relevant to show potential bias on the part of defense expert Dr. Peterson. As the trial court noted, while an expert witness might not normally be required to turn over their financial information, there may be "a plausible argument that the witness generates such a significant portion of his or her income from a particular side or particular attorney that the expert's impartiality can reasonably be questioned." In such cases, the trial court reasoned that the tax returns are relevant and thus discoverable under Rule 26.

But where the matters at issue in a discovery ruling are potentially protected by the right to privacy, merely showing that the matter is relevant and not protected by a privilege does not necessarily guarantee that the matter is discoverable. Trial courts must also balance the plaintiff's "right to discovery ... with the ... [expert's] right of privacy."[24] The Alaska Constitution provides strong protections for matters in which individuals have a subjective expectation of privacy "that society is prepared to recognize as reasonable."[25] Dr. Peterson has argued that he has a right to privacy in his tax returns, and we assume that his expectation is one society would recognize as reasonable.

In *DeNardo v. ABC Inc. RVs Motorhomes*, we held that parties' income tax returns are sometimes discoverable.[26] We explained that "[t]he right to privacy is not absolute," and that "a party who brings a lawsuit [may be required] to reveal information that is relevant to his or her claims, even though the information may otherwise be private."[27] Expert witnesses are not always required to disclose their income tax returns, as they may not always be relevant.[28] But as Judge Rindner pointed out, the expert witness in this case was "not [a] treating physician[ ] brought fortuitously into this litigation but ... a business offering its services with the full understanding that litigation is ongoing." The trial court determined that the income tax returns were relevant and that production of the returns would help clarify any stake the witness might have in the outcome of the case.

In *Jones v. Jennings*, we were faced with a request for production of police officers' personnel files.[29] Recognizing that the officers

22. *Jones v. Jennings*, 788 P.2d 732, 735 (Alaska 1990); *see also Langdon v. Champion*, 752 P.2d 999, 1004 (Alaska 1988); *United Servs. Auto. Ass'n v. Werley*, 526 P.2d 28, 31 (Alaska 1974) ("Given our commitment to liberal pre-trial discovery, it follows that the scope of the attorney-client privilege should be strictly construed in accordance with its purpose." (citation omitted)).

23. Nationally, "[t]here is ... significant disagreement as to whether the measure of protection afforded to tax returns is aptly characterized as a 'privilege'...." *Gattegno v. Pricewaterhousecoopers, LLP*, 205 F.R.D. 70, 72 (D.Conn.2001) (describing conflicting holdings between different courts, in different opinions by the same court, and within the same opinion). The California Supreme Court has interpreted a state statute prohibiting disclosure of state tax information as, in effect, "render[ing] the [tax] returns privileged." *See Webb v. Standard Oil Co.*, 49 Cal.2d 509, 319 P.2d 621, 624 (1957); *see also* M.L. Cross, Annotation, *Discovery and Inspection of Income Tax Returns in Actions Between Private Individuals*, 70 A.L.R.2d 240 (2007).

24. *Marron*, 123 P.3d at 999.

25. *State v. Glass*, 583 P.2d 872, 875 (Alaska 1978); *see* Alaska Const. art. I, § 22.

26. 51 P.3d 919, 928 (Alaska 2002) ("DeNardo has no privacy defense to the discovery [of] information relevant to the lawsuit he instituted [because] ... [his] ... tax returns ... provide evidence of his earning potential, information useful in any damages determination.").

27. *Id.* (quoting *Int'l Ass'n of Fire Fighters, Local 1264 v. Municipality of Anchorage*, 973 P.2d 1132, 1134 (Alaska 1999)).

28. The judicial system must "ensure that governmental infringements of th[e] right [to privacy] are supported by sufficient justification." *Falcon v. Alaska Pub. Offices Comm'n*, 570 P.2d 469, 476 (Alaska 1977).

29. 788 P.2d at 733.

had an expectation of privacy in their personnel files, we adopted the following test:

(1) does the party seeking to come within the protection of the right to confidentiality have a legitimate expectation that the materials or information will not be disclosed?

(2) is disclosure nonetheless required to serve a compelling state interest?

(3) if so, will the necessary disclosure occur in that manner which is least intrusive with respect to the right to confidentiality? [30]

We applied this test to the request for production of the officers' personnel files and concluded that the officers' privacy interests were outweighed by the need to "insure that police behavior conforms to the code of conduct required of a democratic society." [31] We upheld the trial court's orders because they occurred in the least intrusive manner possible: following in camera review and accompanied by an order that family names, addresses, and personal financial information be redacted prior to disclosure. [32]

In this case, Judge Rindner took into account the concerns we articulated in *Jones* in determining whether to order production of the income tax returns. He evaluated the potential evidentiary utility of allowing discovery of the tax returns and determined that they were relevant to show potential bias. He balanced this utility against the burden on Dr. Peterson and TIME and the potential "chilling" effect disclosure would have on expert witnesses and their willingness to participate in future litigation. Ultimately, Judge Rindner found that the Per-

ezes were entitled to discovery of the tax returns in order to "show bias on [the] part of the expert." Rather than ordering the wholesale disclosure of the expert's returns, however, Judge Rindner ordered that disclosure occur under the protection of a confidentiality order. [33] Because Judge Rindner's analysis reflects the balancing in the *Jones* test, we hold that his ruling allowing disclosure of the tax records was not an abuse of his discretion.

Noffke argues that the trial court's ruling was inconsistent with our holding in *Marron v. Stomstad*. [34] In *Marron*, two expert witnesses refused to disclose their tax returns at their depositions. [35] In denying *Marron's* pretrial motion to compel disclosure of the tax returns, the superior court found that while revealing opposing witness bias was important, the plaintiff's right to discovery had to be balanced against the witnesses' right to privacy. [36] In affirming the superior court's ruling, we noted that Alaska Civil Rule 26(b)(2)(i) and (iii) allow a court to limit discovery where the information is obtainable from "some other source that is more convenient, less burdensome, or less expensive," or if "the burden or expense of the proposed discovery outweighs its likely benefit." [37] We concluded that "[b]ecause Marron elicited the information that she sought—that the experts worked primarily for defendants—the superior court did not abuse its discretion in not allowing Marron to discover the witnesses' tax records." [38]

But the posture of this case differs from that in *Marron* in two ways: first, while in

---

**30.** *Id.* at 738.

**31.** *Id.* at 739.

**32.** *Id.*

**33.** On remand, the trial court could follow the lead of other courts by conducting a preliminary in camera review of the records and approving the release of only those portions that are relevant to the proceeding in order to ensure the "least intrusive" disclosure of tax records. *See Ullmann v. Hartford Fire Ins. Co.*, 87 N.J.Super. 409, 209 A.2d 651, 654 (1965) ("The disclosure of entire returns should never be ordered if partial disclosure will suffice, and in all but the clearest cases the return should be examined by the judge before any disclosure is ordered.");

*DeCarvalho v. Gonsalves*, 106 R.I. 620, 262 A.2d 630, 635 (1970) ("The justice shall examine the returns and mask out or excise such portions thereof as will not assist plaintiff in the preparation of his suit and then the returns can be made available to plaintiff.").

**34.** 123 P.3d 992.

**35.** *Id.* at 999.

**36.** *Id.*

**37.** *Id.*

**38.** *Id.*

*Marron* we affirmed the trial court's determination that disclosure of the tax returns was unnecessary in light of other evidence of bias, here, no other evidence of bias was on the record at the time of the trial court's ruling. Second, in *Marron* the experts refused to produce their tax records, whereas here, Dr. Peterson and TIME agreed to produce their tax returns subject to entry of a protective order. We find that it was not an abuse of discretion to order the production of the tax returns.

 Noffke also argues that the $900 sanction the trial court imposed was too large, especially when compared to the $150 sanction against the Perezes for their failure to turn over certain Social Security and employment records. In its order denying Noffke's motion to reconsider the sanction, the trial court ruled that the fine was based on the amount of time the Perezes' attorney indicated she spent on the motion and "the reasonableness (or lack thereof) of the parties' positions." This decision was within the discretion of the court.[39]

## C. It Was Error To Grant a Directed Verdict on Comparative Negligence to the Perezes.

 At trial, after Noffke had called all witnesses who would testify to the comparative fault of the parties, the Perezes moved for a directed verdict on Jose's comparative negligence, alleging that Noffke had presented no evidence that Jose had been at fault in the accident. After hearing oral arguments from both parties, the court granted the directed verdict motion, noting that there had been no evidence presented that Jose had been doing anything inappropriate at the time of the accident and stating that it did not recall any testimony that both parties were at fault in the accident. Later that day, Noffke filed a supplemental memorandum

pointing to her own testimony that both parties were at fault. Noffke also included in her memorandum a proposed jury instruction that driving at or below the posted speed limit does not automatically negate negligence. Noffke argued that based on the road conditions—including the road construction and blocked lane ahead—even if Jose was traveling below the speed limit, he was still traveling at a faster speed than would be considered reasonable. After reviewing this memorandum, the trial court reiterated that there was "no evidence whatsoever" that Jose had done anything wrong to contribute to the accident and concluded that there was no evidence of comparative negligence to support submission of the issue to the jury.

Noffke now points to her testimony on direct examination that she thought both parties were responsible for the accident. The Perezes respond that Noffke's testimony that "both of us" were at fault for the wreck is "oblique and speculative" and is insufficient to defeat a motion for a directed verdict. The Perezes also note that all the evidence was that Jose was traveling at a lawful and reasonable speed.

 We review the trial court's ruling by considering "the evidence in its strongest light most favorable to the non-moving party."[40] We apply "an objective test in determining whether or not fairminded men in the exercise of reasonable judgment could differ."[41] If there is room for diversity of opinion among reasonable people, then the question is one for the jury. Generally, questions of negligence are left to the jury to decide.[42]

Here, the question is whether a jury could have found that Jose breached his duty to drive with proper regard for the safety of himself and others in light of the road work, road conditions, and the speed at which cars

39. See *Grimes v. Haslett*, 641 P.2d 813, 822 (Alaska 1982) ("The trial court has broad discretion in imposing sanctions ... and its decision in these matters will only be overturned upon an abuse of discretion.").

40. *Holiday Inns of Am., Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974).

41. *Id.*

42. See *Maddox v. River & Sea Marine, Inc.*, 925 P.2d 1033, 1035 (Alaska 1996) ("As a general rule, issues of negligence ... are not susceptible to summary judgment due to the highly circumstantial judgments required in their determination, but should be resolved by trial in the ordinary manner." (internal citations omitted)).

in the left-hand lane were driving. At trial, a number of witnesses testified about the speed at which Jose was traveling and the road conditions and construction on Lake Otis Parkway on the day of the accident. Officer Roberts, the officer who responded to the accident, testified that the speed limit on Lake Otis was forty-five miles per hour and that Jose was going about thirty-five miles per hour at the time of the accident. But six days after the accident, Neyda Perez told a doctor that her husband was going forty miles per hour at the time of the accident. Officer Roberts also testified that the accident took place in a construction zone and added that the road conditions were "wet and it had been raining or was raining." Officer Roberts also indicated that road work signs were visible at the scene of the accident, alerting drivers to the changed road conditions ahead.

Taking the evidence in the light most favorable to Noffke, the record could support a finding that the right lane ahead of where the accident occurred was blocked due to construction, that the road was wet, that the left lane of traffic had slowed to a crawl, and that Jose was traveling quickly in the empty right-hand lane past the slow-moving cars in the left-hand lane. Sufficient evidence was presented for a jury to conclude that Jose was partially responsible for the crash because he was traveling at a higher speed than a reasonable and prudent person would under the same circumstances.

 Although the Perezes argue that because Jose was traveling below the posted speed limit, he could not be found negligent, this position is not supported by our case law.[43] While failure to adhere to a posted speed limit might be negligence per se, the opposite is not necessarily true, and adherence to the speed limit does not guarantee a finding that a driver was not negligent.[44]

In light of the evidence presented, there was enough for "reasonable minds to differ,"[45] and therefore the issue of comparative negligence should have been presented to the jury.[46]

## V. CONCLUSION

The exclusion of the medical records was harmful error, and the trial court's decision regarding those exhibits is REVERSED. The ruling granting a directed verdict to the Perezes on comparative negligence is also REVERSED. The court's decisions regarding the tax returns of Noffke's expert witness and discovery sanctions are AFFIRMED. The case is REMANDED for further proceedings consistent with this opinion.

BRYNER, Justice, not participating.

---

**43.** *See Ferrell v. Baxter,* 484 P.2d 250, 265 (Alaska 1971) ("[I]f a reasonably prudent man would take precautions in addition to those statutorily required, the court may ... find defendant negligent for failing to do so."); *Meyst v. E. Fifth Ave. Serv., Inc.,* 401 P.2d 430, 435–36 (Alaska 1965) (finding no error in the trial court's comparative negligence instruction despite evidence showing that defendant was driving more slowly than the posted speed limit); *Vance v. United States,* 355 F.Supp. 756, 760 (D.Alaska 1973) ("Compliance with the statute does not relieve defendant from liability if defendant was negligent in failing to take additional precautions."); *see also* RESTATEMENT (SECOND) OF TORTS § 288C (1965) ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.").

**44.** *See Ferrell,* 484 P.2d at 259 (traffic laws "set the standard of a reasonable man and thereby require a finding of negligence in a tort action if the plaintiff can prove that the defendant committed an unexcused violation").

**45.** *Hagen Ins.,* 139 P.3d at 1219.

**46.** Noffke also argues that the trial court intentionally waited to sign the final judgment until after the new year so that Noffke had to pay a higher rate of prejudgment interest. However, since we have reversed and remanded this case on other issues, it is not necessary to address this issue.