*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS REGIONAL HOUSING AUTHORITY, | ) ) ) ) |
| | Supreme Court Nos. S-17802/17821 |
| | Superior Court No. 4BE-17-00061 CI |
| Appellant and Cross-Appellee, | O P I N I O N |
| v. | No. 7591 – April 15, 2022 |
| DIETRICH MAEL, on his own behalf and on behalf of his minor children D.K. and E.M.; THOMAS MAEL; and ROSE MAEL, | |
| Appellees and Cross-Appellants, | |
| and | |
| STATE OF ALASKA, | |
| Intervenor/Cross-Appellee. | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Terrence P. Haas, Judge.

Appearances: Aaron D. Sperbeck and Shane C. Coffey, Birch Horton Bittner & Cherot, Anchorage, and Thomas Weathers, The Law Offices of Thomas Eagle Weathers, P.C., San Rafael, California, for Appellant and Cross-Appellee. Susan Orlansky, Reeves Amodio, LLC, Anchorage, Russell

L. Winner, Winner & Associates, PC, Anchorage, and Myron Angstman, Angstman Law Office, Bethel, for Appellees and Cross-Appellants. Anna Jay, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Intervenor/Cross-Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices, and Eastaugh, Senior Justice.[*] [Borghesan, Justice, not participating.]

MAASSEN, Justice.

## I. INTRODUCTION

A boiler exploded in a home owned by a nonprofit regional housing authority, severely injuring a man who lived there. He sued the housing authority in both contract and tort, claiming that his lease-purchase contract with the authority included a promise that it would inspect the boiler, which it had failed to do with reasonable care. After the man dismissed his contract claim, the housing authority asked the court to decide as a matter of law that a breach of a contractual promise cannot give rise to a tort claim. But the superior court allowed the man to proceed to trial on his tort claim, and the jury awarded over $3 million in damages, including over $1.5 million in noneconomic damages and separate awards to several of his family members for negligent infliction of emotional distress. The court reduced the man's noneconomic damages award to $1 million because of a statutory damages cap, but it excluded the family members' awards from the amount subject to the cap.

The housing authority appeals. It argues that the superior court erred by concluding that the contract created a continuing legal duty to inspect the boiler with

---

[*] Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

reasonable care. It maintains that it should have been granted a judgment notwithstanding the verdict for that reason. It also argues that it should have been granted a new trial because it had established that the boiler explosion was caused by a product defect rather than negligent inspection. Finally, it argues that the family members' damages for negligent infliction of emotional distress should have been included in the amount subject to the statutory damages cap. The man cross-appeals, arguing that the damages cap violates due process because it fails to account for inflation or the severe nature of his physical injuries.

We uphold the jury verdict because the superior court properly concluded that the housing authority had an independent tort duty to inspect the boiler with reasonable care and because the jury had sufficient evidence to find that the explosion was caused by the housing authority's negligence rather than a product defect. We also conclude that the superior court properly reduced the damages award; the noneconomic damages were properly capped at $1 million and the other family members' emotional distress damages were properly excluded from the amount subject to the cap. We thus affirm the superior court's judgment on all issues.

## II. FACTS AND PROCEEDINGS

### A. Facts

The Association of Village Council Presidents Regional Housing Authority is a nonprofit corporation that provides housing and housing assistance to persons living in the Yukon-Kuskokwim Delta region. The housing authority administers a federal home ownership program established by the Indian Housing Act, which authorizes the Department of Housing and Urban Development (HUD) to enter into contracts to

provide financial assistance to Indian housing authorities.[1]  The program stipulates that in order to receive government funds, a housing authority must enter into a mutual help and occupancy agreement (the Agreement) with each family selected to occupy one of the provided homes.[2]  The Agreement must contain terms such as the family's required initial contribution to the housing authority and its subsequent monthly payments.[3]  The Agreement must also stipulate that the family is "responsible for the maintenance and monthly utility expenses of the dwelling," while the housing authority is responsible for having in effect procedures "sufficient for ensuring the timely periodic maintenance of the dwelling by the family."[4]  Further, the Agreement must allow the family the opportunity to buy the dwelling under a lease-purchase arrangement.[5]

Thomas and Rose Mael moved into a home in Chefornak under this program in 1984.  They did not sign the required Agreement until 1989, but the parties appear to agree that the effective date of their Agreement was the date the Maels moved in.  The Agreement contains the mandated terms noted above, establishing the respective responsibilities of the housing authority and the "homebuyer" — the occupant who had not yet become the owner.  The Agreement states that the homebuyer is responsible for the home's maintenance.  But it also provides that if "the condition of the property creates a hazard to the life, health or safety of the occupants, the [housing authority] shall have the work done" to remedy the problem.

---

[1]     Former 42 U.S.C. § 1437bb(b)(1) (repealed 1996).

[2]     *Id.* at § 1437bb(e).

[3]     *Id.*

[4]     *Id.*

[5]     *Id.*

The Agreement does not have an express expiration date. It stipulates that the "lease under this Agreement" commences upon occupancy and expires when the purchase price has been fully amortized pursuant to a schedule that provides for "a 25-year period." The Agreement explains that it can be terminated in two ways: by a breach of the homebuyer's obligations or by the homebuyer's notice of termination. The Agreement also identifies the two ways the house can be conveyed to the homebuyer: The homebuyer may request to purchase it, or the housing authority may require the homebuyer to purchase it once certain financial thresholds are met. After the housing authority has given notice that the homebuyer is required to purchase the home, all the homebuyer's rights under the agreement are unchanged until the purchase is completed.

The price of the Maels' home became fully amortized, and the home was thus "eligible for conveyance," in 2009. But the home was never formally conveyed to the Maels; the housing authority never notified the Maels that they now had to purchase the home, and neither party ever gave the other notice that the Agreement should be otherwise terminated. The housing authority continued to charge the Maels administrative fees, and it conducted annual inspections of the home nearly every year between 1986 and 2011. The March 2011 inspection, which was labeled as an "Annual" as opposed to a "Final" inspection, did not indicate any problems with the boiler, and Rose Mael confirmed at trial that the Maels were not aware of any problems at the time. No more inspections occurred after 2011.

In January 2016 Rose heard a whistling noise coming from the boiler. She asked Dietrich, her adult son, to take a look at it. As he went to do so the boiler exploded, injuring him severely. He was thrown against a wall, sprayed with scalding water and glycol, and knocked unconscious. He spent about a week in a hospital followed by extensive physical therapy. He testified at trial that he continued to suffer

from debilitating back pain which prevented him from working, playing with his children, or engaging in subsistence activities.

### B. Pre-Trial Proceedings

In 2018 Dietrich sued the housing authority on behalf of himself and two of his minor children. He asserted a negligence claim, alleging that the housing authority assumed a duty to properly inspect the boiler and negligently violated that duty, causing his injuries. He also asserted a breach of contract claim, alleging that the Agreement contained "an express and implied contractual duty to properly inspect" the boiler and that the housing authority violated that duty as well. On behalf of his children, Dietrich alleged that they had heard the explosion, witnessed their father's injuries, and suffered emotional distress as a result of the housing authority's breach of its duty to properly inspect. In its answer the housing authority joined as third-party defendants Burnham LLC, the manufacturer of the boiler, and Dietrich's parents, Thomas and Rose, "for allocation of fault and apportionment of damages." The housing authority alleged that Thomas and Rose's negligent repair and service of the boiler and Burnham's negligent design caused the explosion. Burnham settled with Dietrich and his two children and was dismissed from the case before trial.

### C. Trial Evidence

Trial began in September 2019 and lasted nine days. The jury heard testimony from the Maels about the boiler explosion, along with extensive testimony from medical experts about the scope of Dietrich's injuries and his prospects for improvement.

The jury also heard testimony about the state of the boiler and the cause of the explosion. The jury was read portions of the deposition testimony of a housing authority employee who testified that he was trained and certified in boiler repair. He did not believe the boiler was defective in any way. He testified, however, that boilers

could explode if not maintained and that in his opinion — based on the existence of rust sediment and corrosion on the pressure relief valve — the Maels' boiler had not been properly maintained. He further testified that the housing authority should continue to conduct inspections even after a house becomes eligible for conveyance to make sure it remains safe, and that the housing authority has a duty to make repairs if there is a hazard to the health or safety of one of its residents. He thought that an inspection after 2011 would have detected any problems with the boiler.

An expert in boiler repair testified that a typical homeowner does not know how to service and maintain a boiler. The warning label from the boiler's pressure relief valve was entered into evidence. The label stated that the valve should be removed and physically inspected by a licensed plumber at least once every three years to identify corrosion. It also warned against attempting an inspection "on your own" and that failure to properly inspect could cause serious injury or death.

The housing authority presented the testimony of an engineering expert. He testified that the Maels' use of the boiler to heat their home was a foreseeable use, and that the boiler failed to perform as a reasonable consumer would expect. He testified that the pressure release valve is a boiler's most important safety feature because it is the "last line of defense against overpressure." It was his opinion that the boiler exploded because the control system allowed the water to overheat and a malfunction in the valve allowed the pressure to build until the tank ruptured. He thought the valve failed because of its age and degradation. He acknowledged that an inspection done six months before the explosion may not have detected any danger because the valve could have degraded in six months, though he conceded on cross-examination that an inspection could have revealed an issue. He thought the risks of the design outweighed the benefits, and that Burnham, the manufacturer, should have used a more reliable valve.

The housing authority also called an Indian housing expert to testify about the meaning of the Agreement. This expert testified that all the housing authorities he had worked with interpreted the Agreement to mean that homebuyers were responsible for the maintenance of their homes. In his opinion, the housing authority's responsibility was limited to fixing hazards to health or safety once it learned of them. He opined that the housing authority had no duty to inspect the Maels' home after 2009 when the home became "eligible for conveyance": Twenty-five years had passed since the parties entered into the Agreement, the price of the house had been fully amortized, and the house "should have been conveyed." He based this opinion on a 2008 HUD notice, in effect when the house became eligible for conveyance in 2009. In his opinion there was no legal relationship between the housing authority and the Maels at the time of the explosion because the Agreement had terminated by its own terms.

Following arguments from both parties, the superior court ruled that the Agreement imposed a duty on the housing authority to conduct inspections with reasonable care and that the duty was still in effect at the time of the explosion. The court reasoned that while the homebuyer had an obligation to maintain the home, Congress intended that the relationship be mutual, and the housing authority retained a duty to make sure the home was safe to live in. The court further held that the parties intended this arrangement to last as long as they both had an interest in the home.

## D. Verdict And Post-Trial Motions

After the close of evidence Dietrich dropped his contract claim while retaining a claim for tort damages under the theory that the contract gave rise to a tort duty to inspect the boiler with reasonable care. The housing authority preserved an objection to a jury instruction explaining that the Agreement "required [the housing authority] to perform periodic inspections of the boiler and to exercise reasonable care to discover and remedy any hazardous problems with it" and that the Agreement

remained "in effect at the time of the boiler explosion." The housing authority also moved for a directed verdict, arguing that no reasonable jury could find a breach of duty because the unrefuted evidence established that the Agreement expired in 2009. The court denied the motion.

The jury returned a verdict in favor of the Maels. It found that the housing authority was negligent and that its negligence was a substantial factor in causing harm to the Maels. It concluded that the boiler was not defective and that Thomas and Rose were not negligent in maintaining it. It attributed 100% of the fault to the housing authority. It found that Dietrich suffered a severe permanent physical impairment and awarded him $1,672,000 in economic damages and $1,580,000 in noneconomic damages, for a total award of $3,252,000. The jury also awarded a total of $175,000 to Dietrich's family members on their claims for negligent infliction of emotional distress (NIED).[6]

The housing authority moved for a judgment notwithstanding the verdict (JNOV) and remittitur and for a new trial. In its JNOV motion the housing authority again argued that no reasonable jury could find it had violated a tort duty to inspect, because the parties' relationship was contractual and the evidence established conclusively that their contract ended in 2009. It also argued that the noneconomic damages Dietrich was awarded should be reduced to $1 million under a statutory damages cap[7] and that the emotional distress damages awarded to the other Mael family

---

[6]     Damages may be awarded for the negligent infliction of emotional distress under a "bystander" theory if "(1) the plaintiff is located near the scene of the accident, (2) the shock results from a direct emotional impact from the sensory and contemporaneous observance of the accident, and (3) a close relationship exists between plaintiff and victim." *Kallstrom v. United States*, 43 P.3d 162, 165 (Alaska 2002).

[7]     AS 09.17.010(c).

members should all fall under the same cap. In its motion for a new trial the housing authority argued that the unrefuted evidence established that the explosion was attributable to a defect in the boiler rather than a failure to inspect it.

The superior court granted the housing authority's motions in part. It concluded that the statutory cap limited Dietrich's noneconomic damages award to $1 million but that the other family members' NIED claims were sufficiently distinct injuries that they could not be subject to the same cap. The court denied the JNOV motion because reasonable jurors could differ on the question of tort liability, and it denied the motion for a new trial because the verdict was not against the clear weight of the evidence.

The housing authority appeals the verdict, the court's denial of its JNOV and new trial motions, an evidentiary ruling, and the court's failure to aggregate all of the noneconomic damages awards under a single statutory damages cap. The Maels cross-appeal the application of the cap to Dietrich's damages. The State of Alaska intervened in the superior court and participates on appeal because the case raises constitutional challenges to the damages statute.[8]

---

[8]     *See* Alaska R. App. P. 514(e) ("The clerk of court shall notify the Attorney General of Alaska of the case raising the question [of the constitutionality of a state statute].").

## III.   STANDARD OF REVIEW

We review de novo questions of law involving contract interpretation,[9] jury instructions,[10] and "a statute's constitutionality and interpretation."[11] And unless there are "genuine disputes of material fact, the existence and scope of a legal duty are [also] questions of law which we review de novo."[12]

"In reviewing orders granting or denying JNOV motions, we must 'determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment of the facts.' "[13] "[T]o the extent that a ruling on a motion for [JNOV] involves questions of law, those questions will be reviewed de novo."[14]

"The question of whether to grant or refuse a new trial 'rests in the sound discretion of the trial court.' "[15] "In reviewing the substance of a trial court's order denying a new trial, we view the evidence in the light most favorable to the non-moving

---

[9]   *Flint Hills Res. Alaska, LLC v. Williams Alaska Petrol., Inc.*, 377 P.3d 959, 967 (Alaska 2016).

[10]   *City of Hooper Bay v. Bunyan*, 359 P.3d 972, 978 (Alaska 2015).

[11]   *C.J. v. State, Dep't of Corr.*, 151 P.3d 373, 377 (Alaska 2006).

[12]   *Whitney v. State Farm Mut. Auto. Ins. Co.*, 258 P.3d 113, 116 (Alaska 2011).

[13]   *Alaska Interstate Constr., LLC v. Pac. Diversified Invs., Inc.*, 279 P.3d 1156, 1162 (Alaska 2012) (quoting *Richey v. Oen*, 824 P.2d 1371, 1374 (Alaska 1992)).

[14]   *Id.* (second alteration in original) (quoting *Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.*, 81 P.3d 989, 999 n.10 (Alaska 2003)).

[15]   *Hunter v. Philip Morris USA Inc.*, 364 P.3d 439, 447 (Alaska 2015) (quoting *Kava v. Am. Honda Motor Co.*, 48 P.3d 1170, 1173 (Alaska 2002)).

party . . . ."[16]  We "will only reverse a decision to deny a new trial if the evidence supporting the verdict was so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust."[17]

Finally, "[w]e review the superior court's evidentiary rulings for abuse of discretion."[18]

## IV.    DISCUSSION

The housing authority challenges the jury verdict on several grounds.  It argues that the superior court erred by deciding that the Agreement could create a tort duty that was in effect at the time of the explosion, and that it further erred when it relied on this legal conclusion in denying the housing authority's motion for JNOV and in instructing the jury.  The housing authority also argues that the court should have granted a new trial because the jury's conclusion that the boiler was not defective was against the clear weight of the evidence, and that the court erred when it admitted some of Dietrich's medical records without a proper foundation.

Finally, the housing authority argues that the damages to other Mael family members for negligent infliction of emotional distress should have been aggregated with Dietrich's own noneconomic damages for purposes of the statutory damages cap.  The Maels argue in their cross-appeal that the superior court's application of the damages cap to Dietrich's award violates due process.

---

[16]    *Id.*

[17]    *Id.* (quoting *Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006)).

[18]    *Noffke v. Perez*, 178 P.3d 1141, 1144 (Alaska 2008).

**A.** **The Superior Court Correctly Decided That At The Time Of The Explosion The Housing Authority Owed The Maels A Tort Duty To Inspect The Boiler.**

The housing authority first argues that the superior court erred by concluding that it had a duty to inspect the boiler. The housing authority concedes that the Agreement imposed such a duty; it argues, however, that a contractual promise cannot create a tort duty to inspect, and that any duty created by the Agreement, whether contractual or in tort, necessarily expired in 2009 when the Agreement expired. We conclude that both the Agreement and federal regulations gave rise to a tort duty to inspect the boiler with reasonable care and that this duty still existed at the time of the explosion.

**1.** **The Agreement and federal regulations created a tort duty to inspect the boiler.**

Dietrich initially brought claims against the housing authority for breach of contract and negligence, but he dropped his contract claim. When the housing authority challenged the continued viability of a stand-alone tort claim, the superior court ruled:

> I am going to hold that [Dietrich] may abandon [his] contract claim and pursue it only as a tort claim even though the duty that we're talking about appears to have arisen as a relationship between the parties that is contractual under the [Agreement]. And because that duty was a duty to inspect, and because either a failure to inspect with care or perhaps a failure to inspect altogether is the kind of breach of a duty that is traditionally available under tort law, [I hold] that in this instance the contract is relevant and that the breach of the contract, if found, can also constitute a tort, and that [Dietrich] can pursue the tort independently.

The housing authority argues that this conclusion was error because, as a matter of law, a violation of a duty imposed by contract cannot create liability in tort.

It is true that in most cases "a violation of a duty arising from contract — such as the duty to pay wages under an employment contract or tender payment for goods — does not give rise to a tort claim."[19] "Promises set forth in a contract must [instead] be enforced by an action on that contract."[20] But there is a significant exception: "[W]hen a party's actions violate a general duty of care, its actions may give rise to an action in tort, even if the violation also breaches a contract."[21]

We have recognized such a general duty of reasonable care on the part of a party who has agreed to conduct inspections. In *Adams v. State*, individuals injured in a hotel fire sued the State for negligently inspecting the hotel; the inspector had found serious fire hazards but failed to take any further action to abate them.[22] We observed that it was "ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully"[23] and that this "concept of voluntary assumption of a duty has long been recognized in Alaska."[24] We held that having assumed a duty to conduct fire safety inspections, the State had taken on "a further duty to exercise reasonable care in conducting [the] inspections, and that liability

---

[19]     *Jarvis v. Ensminger*, 134 P.3d 353, 363 (Alaska 2006).

[20]     *Alaska Pac. Assurance Co. v. Collins*, 794 P.2d 936, 946 (Alaska 1990).

[21]     *Jarvis*, 134 P.3d at 363; *see also Alaska Pac.*, 794 P.2d at 946 ("Only where the duty breached is one imposed by law, such as a traditional tort law duty furthering social policy, may an action between contracting parties sound in tort.").

[22]     555 P.2d 235, 236, 238-39 (Alaska 1976).

[23]     *Id.* at 240 (quoting *Glanzer v. Shepard*, 135 N.E. 275, 276 (N.Y. 1922)).

[24]     *Id.*

will attach where there is a negligent failure to discover fire hazards which would be brought to light by an inspection conducted with ordinary care."[25]

We applied this rule again in *Van Biene v. ERA Helicopters, Inc.*, in which the estates of two deceased pilots sued their employer and its insurer.[26] The estates contended that the insurer, when conducting workplace inspections, had negligently failed to detect the conditions that caused the pilots to be dangerously overworked.[27] We followed *Adams*, holding that the insurer could be liable for negligent inspections and quoting as additional support § 324A of the Restatement (Second) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.[28]

Both *Adams* and this restatement of a common law rule support the superior court's conclusion in this case. The housing authority undertook to render a

_____

[25]    *Id.*

[26]    779 P.2d 315, 316 (Alaska 1989).

[27]    *Id.* at 316-17.

[28]    *Id.* at 322 (quoting RESTATEMENT (SECOND) OF TORTS § 324A (AM. L. INST. 1965)).

service — regular boiler inspections — to the Maels as homebuyers, a service it should have "recognize[d] as necessary for the protection of" other persons in the Maels' household as well as their property. The housing authority may therefore be liable to those other persons "for physical harm resulting from [its] failure to exercise reasonable care to [perform its] undertaking."[29]

For the contrary view, the housing authority relies primarily on *Alaska Pacific Assurance Co. v. Collins*, in which we applied the general rule that "[p]romises set forth in a contract must be enforced by an action on that contract."[30] But *Alaska Pacific* can be readily distinguished. A building contractor alleged that his insurer breached the insurance policy by negligently denying coverage and a defense in a homeowner's suit involving claims of faulty construction.[31] The contractual duties at issue in *Alaska Pacific* — to provide insurance coverage and to defend the insured in litigation — have no analog in a "general duty of care,"[32] nor do they implicate the risk of "physical harm" to third parties addressed by § 324A of the Restatement (Second) of Torts.[33] Here, in contrast, the housing authority's contractual duty to inspect carried with it the "further duty" recognized in *Adams*: "to exercise reasonable care in conducting [the] inspections."[34] And in *Alaska Pacific* we explicitly excepted cases involving such a duty from our holding: "[W]here the duty breached is one imposed by law, such as a

---

[29]     *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 324A).

[30]     794 P.2d 936, 946 (Alaska 1990).

[31]     *Id.*

[32]     *See Jarvis v. Ensminger*, 134 P.3d 353, 363 (Alaska 2006).

[33]     *See Van Biene*, 779 P.2d at 322.

[34]     555 P.2d 235, 240 (Alaska 1976).

traditional tort law duty furthering social policy, [then] an action between contracting parties [may] sound in tort."[35]

The housing authority also cites a more recent case in which we declined to graft a tort remedy onto an action based on contract. In *Geotek Alaska, Inc. v. Jacobs Engineering Group, Inc.* a sub-subcontractor on an environmental remediation project claimed, among other things, that the general contractor negligently caused it economic harm by failing to enforce provisions in the subcontract that would have helped ensure that the subcontractor paid the sub-subcontractor for its work.[36]  We began our discussion of this claim by noting that "[t]o determine whether a defendant owes a plaintiff a duty of reasonable care, 'we first determine whether a duty is imposed by statute, regulation, contract, undertaking, the parties' preexisting relationship, or existing case law.' "[37]  It is only if we find no existing duty that we look to various policy considerations — the *D.S.W.* factors — "to determine whether we should recognize a negligence duty not otherwise defined by law."[38]  Here, the duty imposed by contract

---

[35]     794 P.2d at 946.

[36]     354 P.3d 368, 370, 376 (Alaska 2015).

[37]     *Id.* at 376 (quoting *McGrew v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 106 P.3d 319, 322 (Alaska 2005)).

[38]     *Id.* (citing *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981)).  The *D.S.W.* factors are:

> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting

(continued...)

(and by regulation, as we discuss next) carries with it the further duty recognized by "existing case law"; therefore there is no need for us to consider, as we did in *Geotek Alaska*, whether public policy requires us to recognize a novel tort duty.[39]

We note further that the housing authority's duty to inspect has an independent source in federal law. The regulations in place at the time the Agreement was signed placed "overall responsibility" for the home's maintenance and safety on the housing authority:

> The [Indian housing authority (IHA)] shall enforce those provisions of a Homebuyer's agreement under which the Homebuyer is responsible for maintenance of the home. The IHA shall have overall responsibility to HUD for assuring that the housing is being kept in decent, safe and sanitary condition, and that the home and grounds are maintained in a manner that will preserve their condition, normal wear and depreciation excepted. Failure of a Homebuyer to meet his

---

[38]     (...continued)
liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*D.S.W.*, 628 P.2d at 555 (quoting *Peter W. v. S.F. Unified Sch. Dist.*, 131 Cal. Rptr. 854, 859-60 (Cal. App. 1976)).

[39]     We also note that the sub-subcontractor in *Geotek Alaska* relied solely on the foreseeability of harm as establishing an extra-contractual duty of care. 354 P.3d at 377-78. We observed, however, that "we have never held that foreseeable economic harm to an identifiable plaintiff is all that is required to establish a duty of care." *Id.* at 377. Reviewing the other *D.S.W.* factors, we concluded that they failed to support the sub-subcontractor's claim, including the fact that, "as contrasted to negligence creating a risk of death or physical injury, 'we have ascribed little blameworthiness to ordinary negligence that merely causes economic . . . harm.' " *Id.* at 379 (alteration in original) (quoting *Mesiar v. Heckman*, 964 P.2d 445, 451 (Alaska 1998)). A breach of contract that "creat[es] a risk of death or physical injury" — as is at issue here — is more likely to implicate "a traditional tort law duty furthering social policy" of the sort we recognized in *Alaska Pacific*, 794 P.2d at 946.

obligations for maintenance shall not relieve the IHA of responsibility in this respect. Accordingly, the IHA shall conduct a complete interior and exterior examination of each home at least once a year, and shall furnish a copy of the inspection report to the Homebuyer. The IHA shall take appropriate action, as needed, to remedy conditions shown by the inspection, including steps to assure performance of the Homebuyer's obligations under the Homebuyer's agreement.[40]

The housing authority argues that these regulations did not create a duty but rather mandated terms to be included in the mutual help and occupancy agreements. But comparing the regulation's language to that of neighboring sections disproves this theory.[41] The regulation's language is unambiguous as to both its mandatory nature and where the duty lies: "The IHA shall enforce those provisions . . . . The IHA shall have overall responsibility . . . . [T]he IHA shall conduct a complete interior and exterior examination . . . . The IHA shall take appropriate action . . . ."[42]

Because the housing authority had a duty independent of the contract to inspect the boiler subject to the proper standard of care, we conclude that the superior court did not err in its ruling on this issue.[43]

---

[40] Former 24 C.F.R. § 805.306(d) (1979).

[41] *Compare id.* ("[T]he [housing authority] shall conduct a complete interior and exterior examination of each home at least once a year . . . ."), *with* former 24 C.F.R. § 805.306(c) (1979) ("[T]he maintenance rules or regulations shall contain provisions on at least the following subjects: . . . .").

[42] *See Petitioners for Incorporation of City & Borough of Yakutat v. Loc. Boundary Comm'n*, 900 P.2d 721, 724 (Alaska 1995) ("Unless the context otherwise indicates, the use of the word 'shall' denotes a mandatory intent." (quoting *Fowler v. City of Anchorage*, 583 P.2d 817, 820 (Alaska 1978))).

[43] Because the housing authority's challenges to the jury instructions and to
(continued...)

### 2. The housing authority's duty to inspect existed at the time of the boiler explosion.

The housing authority argues that whether its duty was in contract or tort, the duty expired long before the boiler exploded. It concedes that the Agreement required regular inspections, but it contends that any duty it had by contract expired 25 years after the Maels moved in, when federal regulations made the home eligible for conveyance. The housing authority further contends that once it stopped its annual inspections, the Maels maintained and inspected the boiler themselves, indicating their understanding that the responsibility had shifted to them. But we agree with the superior court's conclusion that under the terms of the Agreement the housing authority retained the duty to inspect until the home was formally conveyed and the Maels were given legal title to it.

### a. Contract language

Under the de novo standard of review, "we assess the expectations of the parties to the contract by 'examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties.' "[44] The housing authority's contractual argument relies on the Agreement § 3.2, which provides that the "lease under this Agreement . . . shall expire when the Initial Purchase Price has been fully amortized." Because the initial purchase

---

[43] (...continued) the court's denial of its motion for JNOV rest on the same theory — that the court erred by deciding that "[n]egligence can be found by a person or entity failing to exercise reasonable care in performing a duty or promise set out in a contract" — we reject these challenges as well.

[44] *Black v. Whitestone Ests. Condo. Homeowners' Ass'n*, 446 P.3d 786, 791 (Alaska 2019) (quoting *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004)).

price is amortized over 25 years, the housing authority argues that the Agreement and all of the housing authority's duties under it expired in 2009, 25 years after the Maels moved in. The housing authority essentially argues that the lease and the Agreement are the same thing: When the lease expires upon full amortization of the purchase price, the Agreement expires as well.

But we interpret the term "lease" as referring to some subpart of the Agreement. The contract uses the shorthand term "Agreement" to mean the whole mutual help and occupancy agreement — the parties' entire written contract. The contract provides, "This Mutual Help and Occupancy Agreement ('Agreement') is entered into by and between AVCP RHA ('IHA') and the Homebuyer whose signature(s) appear below." A later provision addresses "the Homebuyer's lease under this Agreement." Under the Agreement the "term of the lease" is the period during which the homebuyer is required to make monthly payments toward the "acquisition of ownership." The Agreement specifies the two ways it can be terminated: The housing authority may terminate it if the homebuyer breaches it, and the homebuyer may terminate it apparently for any reason. In either instance, the party seeking to terminate must give the other party written notice. And " 'Termination' as used in this Agreement does not include acquisition of ownership by the Homebuyer." It is undisputed in this case that the homebuyers did not acquire ownership of the home and that neither party gave the other notice of termination.

The Maels observe that to accept the housing authority's argument that the Agreement simply terminated when the purchase price was fully amortized "would mean that the family would continue to live in a house, with legal title still held by the Housing Authority, but neither party would have any obligations to the other" — a result the Maels contend would be "nonsensical." Notably, the Agreement provides that once the housing authority "has given notice . . . that the Homebuyer is required to purchase his

Home, and until the Homebuyer purchases his Home, he shall have all the rights of a Homebuyer . . . and shall be subject to all the obligations of this Agreement." Although a strict reading of this sentence would indicate that the parties' respective rights and obligations continue until conveyance *only if* the housing authority "has given notice . . . that the Homebuyer is required to purchase his Home," we reject that reading as unlikely.[45] It would be unreasonable to conclude that the *housing authority's* failure to give the required notice means that *homebuyers* lose their contractual rights and obligations as soon as the home becomes eligible for conveyance, whereas the homebuyers retain those rights and obligations if the housing authority *has* given notice. A common sense reading of the Agreement requires us to conclude that it governs the parties' relationship until the home is conveyed to the homebuyer or the Agreement is terminated by either party in accordance with its written notice requirements — neither of which happened here.[46]

### b. Subsequent conduct

The parties' conduct supports a conclusion that they mutually understood the Agreement to be in effect at the time of the explosion. The conduct surrounding

---

[45] *See Est. of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 172 (Alaska 2007) (When interpreting a contract we will prefer "[a]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms . . . to an interpretation which leaves a part unreasonable, unlawful, or of no effect." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (AM. L. INST. 1981))).

[46] The housing authority also relies on the testimony of its Indian housing expert that the Agreement expired 25 years after the Maels entered into it. But that reading led the expert to conclude that there was no legal relationship at all between the housing authority and the Maels at the time of the explosion; the Maels became squatters as soon as the purchase price was fully amortized, with neither party owing any duties to the other. We reject this interpretation as unreasonable; the parties cannot have intended an automatic trigger date that left the Maels' home in perpetual legal limbo.

inspections is mixed. The housing authority concedes that it continued to inspect the home until 2011 — two years after it contends that its duty to do so had expired. It labels these extra inspections "mistake[s]." But the 2011 inspection was marked as "Annual" rather than "Final," giving no indication that there would not be another. The Maels concede that no inspections occurred after 2011. Five years without inspections may be long enough for the Maels to have reasonably understood that there would be no more, and there was little evidence that the Maels ever inquired about their status. But other testimony indicated that inspections were always initiated by the housing authority; the Maels typically waited for the housing authority to act without prompting, and the jury could conclude that this conduct was consistent with the housing authority's retention of the duty.

The housing authority also points to testimony from the Maels that they performed their own maintenance of the boiler after the housing authority's last inspection in 2011. But this is not convincing on the issue of inspections, as the Agreement separately addressed the duties to inspect and to maintain, imposing the duty to maintain on the homebuyer.

More broadly, the housing authority's actions indicate that it understood there to be a continuing legal relationship with the Maels under the Agreement. Although the home's purchase price was fully amortized as of 2009, the housing authority continued to accept the Maels' monthly administrative fees right up to the time of the explosion. The fees are evidence of both the Maels' expectation of some continued services and the housing authority's agreement that some services were still owed. And after the explosion the housing authority repaired damage to the home and replaced the boiler.

In sum, the language and structure of the contract, along with sufficient extrinsic evidence, indicate that the rights and obligations imposed by the Agreement

were intended to remain in effect until the Agreement was terminated or the property was conveyed. The superior court did not err in deciding that the housing authority's duty to inspect still existed at the time of the explosion.

### c. Federal regulations

Federal regulations also support a continuing duty to inspect. Former 24 C.F.R. § 805.306(d), quoted above, required annual inspections at the time the Maels moved into the home and entered into the Agreement. The housing authority relies on a 2008 notice issued by HUD explaining that a housing authority's duty to inspect mutual help homes "expires when unit ownership is conveyed to the homebuyer/purchaser, or when unit ownership should have been conveyed to the homebuyer/purchaser, whichever is sooner."[47] That notice expired in 2010.[48] In 2012 HUD "modifie[d] and update[d]" its notice to say that "the recurring inspection requirement expires when unit ownership is conveyed to the homebuyer/purchaser" — omitting the "or when ownership should have been conveyed" clause.[49] The housing authority argues that because the house should have been conveyed in 2009, when the 2008 guidance was in effect, its duty to conduct annual inspections of the Maels' home was permanently extinguished. According to the housing authority's argument at trial, this meant there was a narrow category of Indian homes that became eligible for

---

[47] U.S. DEP'T OF HOUS. & URB. DEV. OFF. OF PUB. & INDIAN HOUS., PIH-2008-32 (ONAP), REINSTATEMENT OF PIH NOTICE 2006-19 (2008).

[48] U.S. DEP'T OF HOUS. & URB. DEV. OFF. OF PUB. & INDIAN HOUS., PIH-2009-30 (ONAP), EXTENSION (2009).

[49] U.S. DEP'T OF HOUS. & URB. DEV. OFF. OF PUB. & INDIAN HOUS., PIH-2012-45 (TDHEs), RECIPIENT INSPECTION OF HOUSING UNITS ASSISTED UNDER THE NATIVE AMERICAN HOUSING ASSISTANCE AND SELF-DETERMINATION ACT OF 1996 (NAHASDA) (2012).

conveyance between 2008 and 2012 which housing authorities had no duty to inspect even if they still owned them.

We reject the argument that the 2008 guidance shows the intent of the parties at the time they entered into the Agreement decades earlier. "We discern the parties' intent by looking 'to the written contract as well as extrinsic evidence . . . *at the time the contract was made*.' "[50] The housing authority points to no extrinsic evidence from the 1980s, "the time the contract was made," that would illustrate an intent different from what we can discern from looking at the written contract and the regulations then in effect. Furthermore, if subsequent regulations could define the parties' earlier intent, then we would consider not only the 2008 notice but also the 2012 notice which "modifie[d] and update[d]" it, and which — presumably intentionally — omitted the language on which the housing authority relies.[51] Nothing in the 2012 notice indicates that it applies only to homes that become eligible for conveyance after its issuance. If the 2008 notice could extinguish a duty in an existing contract, then the 2012 notice could reinstate it.

---

[50] *Lingley v. Alaska Airlines, Inc.*, 373 P.3d 506, 512 (Alaska 2016) (alteration in original) (emphasis added) (quoting *Larsen v. Mun. of Anchorage*, 993 P.2d 428, 431 (Alaska 1999)).

[51] *Cf. Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 303 (Alaska 2014) (noting that "a provision's omission in a statute typically is interpreted to be intentional when the provision is present in a similar statute" (citing 2B NORMAN J. SINGER & J. D. SHAMBIE SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 51:2, at 213-14 (7th ed. 2007))).

In sum, we agree with the superior court's conclusion that, as a matter of law, both the contract and the federal regulations created a duty to inspect that was in effect at the time of the explosion.[52]

**B.      The Superior Court Did Not Abuse Its Discretion By Denying The Housing Authority's Motion For A New Trial.**

The housing authority next argues that the superior court should have granted its motion for a new trial as it was against "the clear weight of evidence" for the jury to conclude that the housing authority breached a duty to inspect and that the boiler explosion was not caused instead by a design defect.

The housing authority's third-party claim against Burnham was based on the theory that the explosion must have been caused by a defect in the boiler. Burnham settled with Dietrich and his children before trial and was dismissed from the suit. For purposes of considering whether to allocate fault to Burnham,[53] the jury was instructed on both of our recognized tests for determining whether a manufactured product is defective: (1) the boiler "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner" (the consumer expectations test), and (2) "the boiler's design legally caused injury and . . . Burnham LLC fail[ed] to prove, in light of the relevant factors, that, on balance, the benefits of the

---

[52]      Because we agree with the superior court's conclusion that the housing authority's duty to conduct annual inspections continued after the date of its last inspection in 2011, we do not need to discuss the housing authority's argument that it cannot have been negligent for failing to detect a problem with the pressure relief valve during the 2011 inspection.

[53]      *See* AS 09.17.080(a)(2) (requiring trial court to instruct jury to consider "the percentage of the total fault that is allocated to each claimant, defendant, third-party defendant, person who has been released from liability, or other person responsible for the damages").

design outweigh the risk of danger inherent in such design" (the risk-benefit test).[54] The jury found that Burnham did not "supply a defective boiler." We conclude that there was sufficient evidence to support the jury's decision that the housing authority failed to prove that the boiler was defective under either design defect test.

### 1. Consumer expectations test

The housing authority relies on testimony from its boiler expert which it claims is uncontradicted evidence proving a product defect under the consumer expectations test. The expert observed that the Maels were using the boiler for home heating, which was its intended and foreseeable use. He concluded that the pressure relief valve was not functioning properly and was allowing the pressure inside the boiler to rise to a level beyond the strength of the tank to contain it, which resulted in the explosion. When asked if the boiler was well maintained, the expert testified that he did not "see any specific issues with the [valve or] the boiler itself." Based on the age of the unit, his review of the components, and testimony that the boiler was whistling shortly before the explosion, he concluded that the boiler may have exploded even if it had been inspected six months before, because the valve could degrade in that amount of time.

But the expert also testified that the pressure valve was not poorly designed but rather "wasn't sufficient based on the age and the use to prevent [the explosion]." The jury heard that the boiler was 30 years old and that after the explosion the housing authority replaced it with one of the exact same model. And a housing authority repairman testified that the pressure valve clearly was not maintained, as evidenced by corrosion and signs of leakage, and that he did not believe the design was defective. A jury that believed this version of the facts "could intelligently conclude that the [boiler]

---

[54] *See Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1220 (Alaska 1998) (quoting *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 884 (Alaska 1979)).

was [fit] for ordinary use"[55] and therefore reject a design defect theory based on the consumer expectations test.

## 2. Risk-benefit test

The housing authority also relies on its boiler expert's testimony to argue that the Maels "failed to show that on balance the benefits of the challenged design outweighed the risk of danger inherent in such design." The expert testified that the explosion could have been avoided if the boiler had a more reliable pressure relief valve. But weighing the risks and benefits of the chosen design is only one element of the risk-benefit test; the housing authority also had to convince the jury that the "boiler's design legally caused injury."[56] There was enough evidence for a jury to reasonably conclude that the explosion was not caused by a design defect but rather was due to the boiler's age and condition, factors out of Burnham's control. The evidence that something other than the design caused the boiler to explode was not "so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust";[57] we therefore affirm the superior court's denial of the motion for a new trial on the product defect issue.

## C. The Admission Of Dietrich's Medical Records Without A Proper Foundation Was Harmless Error.

The housing authority argues that the superior court abused its discretion when it admitted medical records under the business records exception to the hearsay rule without the required foundational testimony of a records custodian. "As a general

---

[55]     *Id.* at 1221.

[56]     *See id.* at 1220.

[57]     *Hunter v. Philip Morris USA Inc.*, 364 P.3d 439, 447 (Alaska 2015) (quoting *Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006)).

rule hearsay statements are inadmissible at trial unless they fall under an enumerated exception or exclusion . . . ."[58] "Medical records kept by hospitals and doctors are often admitted under the business records exception."[59] This exception, found in Alaska Rule of Evidence 803(6), allows records that are otherwise hearsay to be admitted if five requirements are met:

> [F]irst, the record must be of a "regularly conducted business activity"; second, the record must "be regularly kept"; third, the source of information "must be a person who has personal knowledge"; fourth, the information must have been "recorded contemporaneously with the event or occurrence"; and fifth, "foundation testimony by the custodian of the record" must be provided.[60]

The housing authority does not argue that Dietrich's medical records could not substantively qualify for the business records exception; it does not question the records' content or authenticity. It argues only that the fifth of the Rule's five requirements was not met: There was no foundation testimony provided by the records' custodian. The superior court acknowledged this shortcoming when admitting the records over the housing authority's objection: "I am going to let them in as business records. I would note that it is true that the foundation for that was somewhat thin. On the other hand, medical records are such a common and well-understood exception under the hearsay rules . . . ."

---

[58]     *Wassillie v. State*, 411 P.3d 595, 600 (Alaska 2018).

[59]     *Liimatta v. Vest*, 45 P.3d 310, 318 (Alaska 2002).

[60]     *Wassillie*, 411 P.3d at 600 (quoting *Noffke v. Perez*, 178 P.3d 1141, 1147 (Alaska 2008)).

It was error to admit the records without the foundational testimony required by Rule 803(6). But that conclusion does not end our inquiry; the housing authority "must still show that the error was harmful or prejudicial."[61]

"The test for determining whether an error was harmless is 'whether on the whole record the error would have had a substantial influence on the verdict of a jury of reasonable laymen.' "[62] The housing authority posits two theories of prejudice: The error allowed the jury to consider hearsay evidence of Dietrich's "medical issues, diagnosis, and prognosis," and the error allowed him to use the sheer "volume of the records (hundreds and hundreds of pages) to reinforce the seriousness of the injuries." While neither argument calls into question the jury's finding of liability, the arguments could, if accepted, affect the amount of damages awarded.

We conclude, however, that any effect this evidence could have had on the jury was harmless. The jury was exposed to the same information in unobjectionable ways. The jury saw the stack of medical records during the testimony of a medical expert, who relied on them in his testimony and described the volume as "[p]ushing 600 pages." And the jury learned of the records' content through the extensive testimony of medical experts including two doctors and a rehabilitation specialist, along with Dietrich's own testimony about his injuries. The housing authority's brief discussion of this issue on appeal does not suggest any information the jury could have learned from the erroneously admitted medical records that was both prejudicial and not otherwise in evidence. Because the error could not have had a substantial influence on the jury, the

---

[61] *Noffke*, 178 P.3d at 1147; *see also Jones v. Bowie Indus., Inc.*, 282 P.3d 316, 328 (Alaska 2012) ("Even though admission of evidence is erroneous, we will reverse only if the error was not harmless.").

[62] *Noffke*, 178 P.3d at 1147-48 (quoting *Dalkovski v. Glad*, 774 P.2d 202, 207 (Alaska 1989)).

superior court's failure to require foundational testimony from a records custodian was harmless error.

**D.** **The Superior Court Did Not Err By Applying The Statutory Noneconomic Damages Cap To Dietrich's Award.**

The jury awarded Dietrich $1,580,000 in noneconomic damages, a category the jury instructions defined as "a fair amount to compensate him for past and future pain and suffering, loss of enjoyment of life, and physical impairment resulting from the injury." The superior court reduced that award pursuant to AS 09.17.010(c). The statute provides that when noneconomic damages "are awarded for severe permanent physical impairment or severe disfigurement," they "may not exceed $1,000,000 or the person's life expectancy in years multiplied by $25,000, whichever is greater."[63]

The Maels argue that the court's reduction of the damages award violated Dietrich's substantive due process rights in two ways. First, they argue that imposing the cap is "arbitrary and irrational" because "inflation has significantly eroded the value of the award" since the time the legislature decided the cap's amount. Second, they argue that the cap "unreasonably fails to allow an exception for a plaintiff with the most serious imaginable non-economic injuries." The Maels acknowledge that we have upheld the cap's constitutionality in previous cases, but they argue that those cases involved facial challenges to the statute, whereas they are challenging the statute only as applied to Dietrich.[64] They argue that they should prevail even under rational basis

---

[63] AS 09.17.010(c).

[64] A facial challenge to a law's constitutionality alleges that the law is unconstitutional "as enacted"; we will uphold a law against a facial challenge "even if it might occasionally create constitutional problems in its application, as long as it 'has a plainly legitimate sweep.' " *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 1000 (Alaska 2019) (quoting *Planned Parenthood of the Great Nw. v. State*, 375

(continued...)

review, but also that we should apply intermediate scrutiny because noneconomic interests are at stake — namely Dietrich's "very will to live."

### 1.    We review the due process claims for rational basis.

"Substantive due process is a doctrine that is meant to guard against unfair, irrational, or arbitrary state conduct that 'shock[s] the universal sense of justice.' "[65] "We have employed three standards under which claims of substantive due process violations may be reviewed:  strict scrutiny, intermediate scrutiny, and rational basis review."[66] Strict scrutiny is reserved for those cases in which "a law substantially burdens a fundamental right"; in such cases "the State must articulate a *compelling* state interest that justifies infringing the right and must demonstrate that no less restrictive means of advancing the state interest exists."[67] Intermediate scrutiny is applied when "state action interferes with an individual's liberty interest that is not characterized as fundamental"; in such cases "the State must show a legitimate state interest and a 'close and substantial relationship' between that interest and the chosen means of achieving it."[68] The most lenient level of scrutiny is rational basis review, under which "the party claiming a

---

[64]    (...continued)
P.3d 1122, 1133 (Alaska 2016)).  An as-applied challenge alleges that although the law may be constitutional in some circumstances, it is unconstitutional under the particular facts of the case.  *State v. ACLU of Alaska*, 204 P.3d 364, 372 (Alaska 2009).

[65]    *Doe v. Dep't of Pub. Safety*, 444 P.3d 116, 125 (Alaska 2019) (alteration in original) (quoting *Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1130 (Alaska 1999)).

[66]    *Id.*

[67]    *Id.* (emphasis in original).

[68]    *Id.* at 125-26 (quoting *Sampson v. State*, 31 P.3d 88, 91 (Alaska 2001)).

substantive due process violation has the burden of showing that there is no rational basis for the challenged legislation."[69]

"[W]e have consistently held that restrictions on the types or amounts of damages that a plaintiff can pursue in court impair economic interests only" and therefore are subject to the most lenient scrutiny, rational basis review.[70]  Both of the Maels' challenges to the statutory damages cap are economic.  Their first challenge — that the statute arbitrarily fails to account for inflation — is squarely about the "amount[] of damages that a plaintiff can pursue."[71]

The Maels argue that their second challenge — that the cap does not account for the most seriously injured plaintiffs — requires intermediate scrutiny because the extent of Dietrich's injuries implicates his will to live.  But we rejected essentially the same argument in *C.J. v. State, Department of Corrections*, in which a woman who had been attacked by a man out on parole sued the State for negligence.[72]  The superior court ruled that her damages were subject to the $400,000 damages cap.[73]  On appeal the plaintiff argued that the cap violated the Alaska Constitution's equal protection clause by creating two separate classes of plaintiffs:  those fully compensated because their noneconomic damages fell below the cap and those who could not be fully compensated

---

[69]     *Id.* at 126.

[70]     *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1132 (Alaska 2009) (quoting *C.J. v. State, Dep't of Corr.*, 151 P.3d 373, 379 (Alaska 2006)).

[71]     *Id.* (quoting *C.J.*, 151 P.3d at 379).

[72]     151 P.3d at 376.

[73]     *Id*. at 377; *see* AS 09.17.010(b) (limiting noneconomic damages "arising out of a single injury or death" to $400,000, "[e]xcept as provided under (c) of this section" providing the higher cap "when the damages are awarded for severe permanent physical impairment or severe disfigurement").

because their damages were reduced by the cap.[74]  We concluded that the plaintiff's interests were economic and rejected the notion that a "disproportionate amount of pain and suffering compared to monetary loss" warranted a higher level of scrutiny.[75]

The Maels also argue that the degree of Dietrich's suffering is so elevated that an interest higher than the merely economic is necessarily implicated.  While the degree of Dietrich's injury may be heightened, as in *C.J.*, the nature of his claim is still about the "amount[] of damages that [he] can pursue" and is therefore economic.[76]  Rational basis review thus applies to both of the Maels' due process arguments.  Their burden to prove the statute's unconstitutionality "is a heavy one, for if any conceivable legitimate public policy for the enactment is apparent on its face or is offered by those defending the enactment, the opponents of the measure must disprove the factual basis for such a justification."[77]

### 2. The statutory cap's failure to account for inflation does not violate Dietrich's right to due process.

The Maels contend that the damages cap violates Dietrich's right to substantive due process, as applied to him, because time and inflation have arbitrarily reduced the cap's real value from the level the legislature considered appropriately compensatory when the cap was enacted in 1997.  The Maels argue that if the cap is adjusted for inflation, as it should be, Dietrich's jury award falls below it.

---

[74]    *C.J.*, 151 P.3d at 378.

[75]    *Id.* at 380-81.

[76]    *L.D.G., Inc.*, 211 P.3d at 1132 (quoting *C.J.*, 151 P.3d at 379).

[77]    *Doe v. Dep't of Pub. Safety*, 444 P.3d 116, 126 (Alaska 2019) (quoting *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974)).

As a preliminary matter, we reject the Maels' characterization of their argument as an as-applied challenge. "An as-applied [constitutional] challenge requires evaluation of the facts of the particular case in which the challenge arises,"[78] while a facial challenge means "that there is no set of circumstances under which the statute can be applied consistent with the requirements of the constitution."[79] The Maels argue that "there is no rational basis for limiting such a plaintiff to an award worth only 60% of the value of the award the legislature approved." But they do not explain why the 60% figure should have any special significance, and all litigants are affected by inflation to some degree. If the cap's failure to account for inflation violates due process as it is applied in this case, then there is "no set of circumstances under which the statute can be applied consistent with the requirements of the constitution."[80]

We have repeatedly upheld the constitutionality of the noneconomic damages cap as against facial challenges. Shortly after the statute was passed, a group of plaintiffs and prospective plaintiffs sought a declaratory judgment that the cap was unconstitutional because it violated the Alaska Constitution's equal protection and due process clauses.[81] In *Evans ex rel. Kutch v. State* an equally divided court upheld the superior court's ruling that the cap did not violate either protection.[82] We first concluded that "the plaintiffs' interests in unlimited damages are merely economic" and that the

---

[78]     *Dapo v. State, Off. of Child.'s Servs.*, 454 P.3d 171, 180 (Alaska 2019) (alteration in original) (quoting *Kyle S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 1262, 1268 (Alaska 2013)).

[79]     *State v. ACLU of Alaska*, 204 P.3d 364, 372 (Alaska 2009).

[80]     *Id.*

[81]     *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1048, 1050 (Alaska 2002).

[82]     *Id.* at 1070.

State's enumerated interests in applying the cap — discouraging frivolous litigation, curbing excessive damages awards, and controlling insurance rates — were legitimate.[83] We applied the "low end" of the sliding scale for review of equal protection claims, which requires a substantial relationship between the legislative objectives and the statute.[84] We recognized a substantial relationship and held that the cap therefore did not violate equal protection.[85]

We rejected an argument raised by the appellants in *Evans* that across-the-board application of a single cap was not substantially related to the legislature's goals because it failed to account for rural Alaskans' higher costs of living.[86] The Maels' inflation argument relies on similar logic: that the statute is unconstitutional because it does not provide all Alaskans with compensation of the same real value. In *Evans* we noted that "[t]here is also no violation of equal protection merely because the damages caps do not provide for cost of living adjustments."[87] And because the "substantive due

---

[83]      *Id.* at 1052-53.

[84]      *Id.* at 1054.

[85]      *Id.* at 1055.

[86]      *Id.* at 1054.

[87]      *Id.* at 1055.

process test is a more deferential version of the equal protection test already discussed," the statute complied with due process as well.[88]

The *Evans* decision is not binding because the court was evenly divided.[89] But in *C.J.* we adopted *Evans*'s controlling opinion and relied on it in rejecting facial and as-applied challenges to the noneconomic damages cap.[90] We reiterated that noneconomic damages awards are "subject to minimal protection"; they are by definition one-time awards and therefore not "source[s] of sustaining income" that would merit higher protection.[91] We concluded that the means-end fit between the cap and the goal of lowering the cost of insurance was satisfied: the legislature was entitled to decide that large damage awards overestimate the value of a victim's noneconomic loss, and it could reasonably conclude that alternative ways of addressing insurance costs would be less fair than the cap.[92]

Although in *C.J.* we addressed an equal protection challenge, the equal protection analysis involves a more exacting standard than the rational basis review we

---

[88]     *Id.* The dissenting opinion of the equally split court in *Evans* would have held that the cap violated equal protection.  The dissent disagreed with the controlling opinion's conclusion that the interest in damages is purely economic and receives only the lowest level of equal protection scrutiny.  *Id.* at 1072 (Bryner, J., dissenting).  The dissent also disagreed with the controlling opinion's means-to-end analysis.  *Id.* at 1074.  The dissent did not address due process as it related to the damages cap.

[89]     *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1130 (Alaska 2009).

[90]     *C.J. v. State, Dep't of Corr.*, 151 P.3d 373, 375, 379-81 (Alaska 2006).

[91]     *Id.* at 380.

[92]     *Id.* at 381.

apply in due process cases.[93]  The Maels do not point to any compelling reason for us to change our analysis in *Evans* and *C.J.*  We must therefore reject their facial challenge to the noneconomic damages cap.

### 3. The damages cap rationally considers the extent of a plaintiff's suffering.

The Maels next argue that we should limit *C.J.* and *Evans* by making exceptions for the "most serious imaginable non-economic injuries," observing that Dietrich has suffered an extreme form of pain.  They argue that the cap has left Dietrich so undercompensated that it has lost any substantial relationship to the legislative purposes.  Because this argument relies on the specific facts of Dietrich's case — the extent of his injuries — it is appropriately characterized as an as-applied challenge.[94]

But our analysis in *C.J.* still controls.  The victim in *C.J.* argued that it was "irrational to single out the most severely injured tort victims to pay for the reduction in premiums."[95]  She argued that the inequity was especially " 'exacerbated' when applied to her because (1) as a rape victim, her injury involves a 'disproportionate amount of pain and suffering compared to monetary loss' and (2) as a low-wage earner her 'recovery will depend almost entirely on noneconomic damages.' "[96]  We rejected the plaintiff's argument, noting that "while limiting the noneconomic damages for such a grievous injury may seem harsh, we have held that 'under a minimum scrutiny [equal

---

[93]     *Evans*, 56 P.3d at 1055.

[94]     *See Dapo v. State, Off. of Child.'s Servs.*, 454 P.3d 171, 180 (Alaska 2019).

[95]     *C.J.*, 151 P.3d at 380.

[96]     *Id.* at 381.

protection] analysis, we do not determine if a regulation is perfectly fair to every individual to whom it is applied.' "[97]

Furthermore, the legislature specifically addressed the most seriously injured plaintiffs by creating two separate damage caps. The cap is set at "$400,000 or the injured person's life expectancy in years multiplied by $8,000, whichever is greater," for "a single injury or death" but it allows awards up to "$1,000,000 or the person's life expectancy in years multiplied by $25,000, whichever is greater, when the damages are awarded for severe permanent physical impairment or severe disfigurement."[98] Dietrich was subject to the higher of the two caps.[99] Although the cap is not perfectly tailored to the extent of Dietrich's loss as determined by the jury, we must reject the argument that the legislature irrationally failed to account for the suffering of the most severely injured plaintiffs.

**E.**  **The Superior Court Did Not Err By Concluding That Dietrich's Noneconomic Damages And The Other Family Members' Damages For Negligent Infliction Of Emotional Distress Were Not Subject To The Same Statutory Cap.**

The housing authority also takes issue with the superior court's application of the noneconomic damages cap. It argues that the court should have aggregated Dietrich's noneconomic damages award of $1,580,000 with the amounts awarded to his family members for NIED, totaling $175,000, and applied the cap to the total rather than capping only Dietrich's award; in other words, that the noneconomic damages to

---

[97]     *Id.* (quoting *Eldridge v. State, Dep't of Revenue*, 988 P.2d 101, 104 (Alaska 1999)).

[98]     AS 09.17.010(b)-(c).

[99]     *See* AS 09.17.010(c).

Dietrich, his two children, and his parents combined should have been reduced to no more than $1,000,000.

The statutory caps are for damages "arising out of a single injury or death."[100] The determinative question here, therefore, is whether the damages awarded to Dietrich, his two children, and his parents all arose "out of a single injury." The superior court decided that the NIED injuries suffered by Dietrich's family members were "sufficiently distinct" from Dietrich's injury that they were subject to separate caps. The housing authority contends, however, that the cap is intended to apply to each "occurrence," and that all the Maels' claims arose out of a single occurrence, the breach of the duty to inspect. The Maels counter that the NIED claims are not merely derivative of Dietrich's injuries, as they involve injuries the NIED plaintiffs suffered directly, and that holding otherwise would lead to nonsensical results.

"To determine the meaning of a statute, we 'look to the meaning of the language, the legislative history, and the purpose of the statute and adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[101] "Under our 'sliding scale approach to statutory interpretation, . . . "the plainer the statutory language is, the

---

[100] AS 09.17.010(b). The statute also states that "[m]ultiple injuries sustained by one person as a result of a single incident shall be treated as a single injury for purposes of this section." AS 09.17.010(d).

[101] *Bohn v. Providence Health Servs.-Wash.*, 484 P.3d 584, 593-94 (Alaska 2021) (quoting *Alaska Spine Ctr., LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 180-81 (Alaska 2019)).

more convincing the evidence of contrary legislative purpose or intent must be" ' to convince this court to adopt a different meaning."[102]

We first observe that NIED involves an injury unique to the victim, separate from the witnessed injury that caused it. We have explained that "[u]nlike claims for loss of consortium, claims for emotional distress concern injuries that the claimants have suffered directly, rather than derivative injuries that resulted from an injury to another."[103] But this does not settle the statutory interpretation issue, as the statute uses broad language for the cap's reach, applying it not just to each injury but to all claims "arising out of a single injury or death."[104] "Arise" means to originate from or to stem from.[105] The statute's plain language shows a legislative intent to include in the cap more than just a single plaintiff's direct claim.

Our case law, however, does not support an interpretation that would subject the claims of separately injured plaintiffs to a single cap. In *C.J.* we addressed both the cap's application to damages "arising out of a single injury or death" and the additional limitation of AS 09.17.010(d), which provides that "[m]ultiple injuries sustained by one person as a result of a single incident shall be treated as a single injury for purposes of this section."[106] We concluded that the plaintiff who was sexually assaulted three times during one attack was entitled to recover up to the cap amount for

---

[102]    *Id.* at 594 (alteration in original) (quoting *Alaska Spine Ctr., LLC*, 440 P.3d at 181).

[103]    *State Farm Mut. Auto. Ins. Co. v. Lawrence*, 26 P.3d 1074, 1079 (Alaska 2001).

[104]    AS 09.17.010.

[105]    *Arise*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[106]    *C.J. v. State, Dep't of Corr.*, 151 P.3d 373, 382 (Alaska 2006).

each instance of assault.[107] We held that each penetrative act was its own "distinct act[], each an intentional tort, each causing a separate injury."[108] We explained that the damages cap "is intended to limit recovery for a single tortious act that causes multiple injuries"; "[e]liminating liability for distinct tortious acts that cause distinct injuries would run counter to the stated purpose of the statute to decrease the cost of litigation 'without diminishing the protection of innocent Alaskans' rights to reasonable, but not excessive, compensation for tortious injuries caused by others.' "[109] Central to our discussion in *C.J.* was the fact that the case involved a single victim and multiple injuries; in the instant case there are multiple victims, each suffering a distinct injury.

In *L.D.G., Inc. v. Brown* we held that derivative claims arising out of a single injury are subject to the same cap, but the result was driven by clear statutory language.[110] Two children who prevailed on a loss of parental consortium claim argued that the damages cap violated the fairness prong of equal protection as applied to them because it irrationally required multiple claimants to split a single recovery in a manner that bore no relationship to their actual losses.[111] The children argued that the statutory phrase "arising out of a single injury or death" should be interpreted to refer to each separate claim of a surviving dependent, because each surviving dependent had a

---

[107]    *Id.* at 384.

[108]    *Id.* at 383.

[109]    *Id.* (quoting Ch. 26, § 1(1), SLA 1997). We also noted that the damages cap was a derogation of common law and therefore must be construed narrowly. *Id.* at 383 n.52.

[110]    211 P.3d 1110, 1135 (Alaska 2009).

[111]    *Id.* at 1131.

separate cause of action.[112] We rejected that argument, noting that the lack of modifiers on "all claims" and language in the legislative history applying the cap per "occurrence" indicated that "the legislature was aware that multiple individuals could have claims arising from a single death or injury, and that the legislature nevertheless intended to apply a single cap to all such claims" arising from each "occurrence."[113]

Our reasoning in *L.D.G.* relied on the fact that the claims at issue were derivative claims for loss of consortium.[114] The legislature expressly identified such claims as subject to the "single injury or death" cap, intended to cover "the damages awarded by a court or a jury . . . for all claims, including a loss of consortium claim."[115] But we have recognized NIED as involving a separate injury to a different victim, so *L.D.G.*'s reasoning does not apply to the emotional distress damages awarded to Dietrich's children and parents.

Rather, because the Mael family members' NIED claims involve injuries separate from those suffered by Dietrich, each reflects a "single injury" subject to the statutory cap. This conclusion is consistent with legislative intent as well as the statutory language. One of the cap's primary purposes was to ensure fair but not excessive compensation for tort victims.[116] Applying one cap to victims who have suffered distinct injuries would not be consistent with this purpose. One victim's recovery could leave other victims with no or a significantly reduced damage remedy. We do not believe the

---

[112]    *Id.* at 1134.

[113]    *Id.* at 1135.

[114]    *Id.*

[115]    AS 09.17.010(b).

[116]    Minutes, House Judiciary Comm. Hearing on H.B. 58, 20th Leg., 1st Sess. (Feb. 21, 1997) (sponsor statement of Rep. Brian Porter).

legislature intended such a result.[117] The superior court did not err when it decided that the awards of noneconomic damages to Dietrich and his family members were subject to separate statutory caps.

## V. CONCLUSION

The judgment of the superior court is AFFIRMED.

---

[117] An amendment to narrow the cap to "all claims of a person . . . arising out of a single injury or death" was adopted by the House Finance Committee out of concern that the statute "could be interpreted [to mean] that the cap applies in aggre[g]ate," but that language was omitted from the final version of the bill. Minutes, House Fin. Comm. Hearing on H.B. 58, 20th Leg., 1st Sess. (Mar. 14, 1997); Ch. 26, § 9, SLA 1997.

The housing authority points to several references to "occurrence" in the committee minutes and in a sectional summary to indicate that the legislature did not intend the cap to apply per claimant. Senate Rules Comm., Sectional Analysis of Proposed H.B. 58 § 9, 20th Leg., 1st Sess. at 2-3 (Apr. 16, 1997); Minutes, Senate Rules Comm. Hearing on H.B. 58, 20th Leg., 1st Sess. (Apr. 15, 1997) (statement by Rep. Porter); *see Occurrence*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An accident, event, or continuing condition that results in personal injury or property damage that is neither expected nor intended from the standpoint of an insured party."). And we relied on those passing mentions of "occurrence" in *L.D.G.*, 211 P.3d at 1135. But for reasons explained above we do not think "occurrence" should be read so broadly as to include separate injuries suffered by separate victims.